RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 05a0463p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

No. 04-5887

KEVIN MCCLAIN; GEORGE BRANDT, III; JASON
DAVIS,

*Defendants-Appellees.*

>

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 02-00126—William J. Haynes, Jr., District Judge.

Argued: July 20, 2005

Decided and Filed: December 2, 2005

Before: BOGGS, Chief Judge; BATCHELDER and GIBBONS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Thomas M. Gannon, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Richard L. Gaines, ELDRIDGE & GAINES, Knoxville, Tennessee, Peter J. Strianse, TUNE, ENTREKIN & WHITE, Nashville, Tennessee, for Appellees. **ON BRIEF:** Thomas M. Gannon, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Richard L. Gaines, ELDRIDGE & GAINES, Knoxville, Tennessee, Peter J. Strianse, TUNE, ENTREKIN & WHITE, Nashville, Tennessee, R. Price Nimmo, NIMMO, HOEHN & NIMMO, Nashville, Tennessee, for Appellees.

BATCHELDER, J., delivered the opinion of the court, in which GIBBONS, J., joined. BOGGS, C. J. (pp. 8-10), delivered a separate opinion concurring in the judgment.

_____

## OPINION

_____

ALICE M. BATCHELDER, Circuit Judge. On July 25, 2002, a federal grand jury returned an indictment charging Defendants-Appellees Kevin McClain, George Brandt III, and Jason Davis with conspiracy and substantive marijuana trafficking in violation of 21 U.S.C. §§ 841(a)(1) and 846. The defendants moved to suppress all evidence obtained during and as a consequence of a warrantless search of McClain's residence on October 12, 2001, including evidence seized during execution of search warrants issued on the basis of evidence obtained as a result of that initial

warrantless search. The district court granted the motions, holding that the warrantless search of McClain's residence was not justified by exigent circumstances, the good faith exception to the exclusionary rule did not apply to these circumstances, and the derivative evidence must be suppressed. Although we agree with the district court's conclusion that there was neither probable cause nor exigency to justify the warrantless search of McClain's residence, we find that, under the particular facts of this case, the good faith exception to the exclusionary rule applies. We will therefore reverse the judgment granting the motions to suppress.

## I. FACTUAL AND PROCEDURAL HISTORY

At around 9:30 p.m. on October 12, 2001, the dispatch operator for the Hendersonville, Tennessee Police Department received a phone call from a concerned neighbor who reported seeing a light on in a house located at 123 Imperial Point, which had been vacant for several weeks. The police dispatcher contacted Officer Michael Germany and notified him of a possible "suspicious incident" at that address. Upon arriving near the scene a couple minutes later, Officer Germany parked his police cruiser about 100 yards away and took up a position behind a tree across the street from the residence. From that vantage point, Officer Germany watched the house for a few moments and confirmed that lights were on in a bedroom on the west side of the house and in the dining area in the center of the house.

Moving to a position behind a tree closer to the house, Officer Germany watched the house for several more minutes but observed no movement either inside or outside the house. He then performed a complete inspection of the outside of the house and found no open or unlocked windows, doors or gates, and no sign of forced entry or illegal activity, until he reached the front of the house. There, he found that the front door was slightly ajar; that is, the wooden door was touching the door frame, but the door was not fully secured, the dead bolt lock was visible, and he could see a sliver of light showing through the crack, which he estimated to be less than an inch wide.

Although Officer Germany had seen no movement in or around the house, or any signs of forced entry or vandalism, or any kind of criminal activity, he was nevertheless concerned that the open door and the lights might be signs that a burglary was in progress or that juveniles had entered the house to vandalize or engage in underage drinking. He therefore sent out a general call for back-up, and within a few minutes, Officer Jason Williams arrived at the house. Officer Germany suggested that they "clear" the house because the open door could indicate a crime in progress, and the officers walked up to the front porch and pushed the wooden door the rest of the way open. Officer Germany announced their presence loud enough so that anyone inside could hear him, and after waiting for "approximately two to five minutes" and receiving no response from inside the house, they entered with their guns drawn. Moving from room to room in order to clear it of any potential perpetrators, the officers found no furniture in the house except a television set on the living room floor. They found fast food wrappers on the kitchen counter and a piece of luggage and a child's toy in one of the bedrooms in the house. After securing the upstairs rooms, the officers moved to the basement where they observed that the windows were covered with inward-facing reflective paper and that a large room contained a substantial amount of electrical wiring connected to a junction box and what appeared to be plant stimulators. The basement also contained a number of boxes marked as grow lights. While neither officer saw any marijuana in the house or observed any illegal activity, both concluded that a marijuana grow operation was being set up in the basement of the house. Following their search of the basement, the officers cleared the garage and, finding nothing, left the premises.

That same night, Officer Germany's supervisor contacted Officer Brian Murphy of the Sumner County Drug Task Force concerning the search at 123 Imperial Point. Officer Murphy determined that the home was owned by Kevin and Tina McClain. The next day, after receiving

Officer Germany's report on the search of 123 Imperial Point, Officer Murphy began investigating a possible marijuana grow operation at the home. He placed the property under off-and-on surveillance for several weeks and eventually determined that McClain, Brandt and Davis were engaged in setting up a marijuana grow operation at 123 Imperial Point and at several other residences.

On November 27, 2001, Officer Murphy obtained warrants to search the house at 123 Imperial Point and five other properties that he had linked to the defendants through his investigation and surveillance. The warrant affidavit explicitly relied in part on evidence obtained during the initial warrantless search of 123 Imperial Point conducted on October 12 and described the circumstances of that search. When law enforcement authorities executed the warrants on November 28, 2001, they recovered from 123 Imperial Point 348 marijuana plants and various types of plant growing equipment. The searches of the other five properties for which Officer Murphy had obtained warrants also uncovered numerous marijuana plants and plant-growing paraphernalia.

Based on information obtained during these searches, as well as post-arrest statements made to the police by Brandt and Davis, a federal grand jury returned a three-count indictment charging McClain, Brandt, and Davis with conspiring to manufacture and to possess with intent to distribute more than 1,000 marijuana plants in violation of 21 U.S.C. § 846; manufacturing and possessing with intent to distribute 1,000 or more marijuana plants in violation of 21 U.S.C. § 841(a)(1); and possessing with intent to distribute less than 50 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1). McClain moved to suppress the evidence found during the searches on October 12 and November 28 of his home located at 123 Imperial Point. Brandt and Davis moved to suppress evidence obtained during the searches, as well as their post-arrest statements.[1] After an evidentiary hearing, the district court granted each defendant's motion to suppress. The court found that the warrantless entry and search of 123 Imperial Point violated the Fourth Amendment, necessitating the suppression of all evidence derivative of that warrantless search, and that the good faith exception to the exclusionary rule established in *United States v. Leon*, 468 U.S. 897 (1984), did not apply. The United States filed a timely notice of appeal.

## II. DISCUSSION

### A. STANDARD OF REVIEW

The government contends on appeal that the district court erred in granting the defendants' motions to suppress. In reviewing a district court's decision regarding a motion to suppress evidence, we review all factual findings for clear error and all legal conclusions *de novo*. *United States v. Yoon*, 398 F.3d 802, 805 (6th Cir. 2005). In particular, we review *de novo* the district court's determinations that no exigency existed to justify the Hendersonville police officers' warrantless entry into McClain's home, that all subsequently seized evidence constituted the fruit of the initial illegal search, and that the good faith exception to the exclusionary rule does not apply to this evidence. *See United States v. Rohrig*, 98 F.3d 1506, 1511 (6th Cir. 1996).

---

[1]The United States argued before the district court that Brandt and Davis did not have standing to challenge the search of 123 Imperial Point. The district court concluded that McClain had standing because 123 Imperial Point was his home and was not abandoned, found that Brandt had standing, and did not discuss Davis. The court then immediately went on to discuss the suppression issues, leaving the standing issue partially unresolved. Although the record provides no basis on which this court could find Davis had standing to contest the search, the United States did not raise the issue of standing before this court. We therefore have no occasion to discuss the matter.

## B.  LEGALITY OF THE WARRANTLESS SEARCH

We first address the legality of the warrantless search of McClain's residence.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  U.S. CONST. amend. IV.  Because the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," *United States v. United States District Court*, 407 U.S. 297, 313 (1972), "a search carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'"  *Coolidge v. New Hampshire*, 403 U.S. 443, 474-75 (1971).  More precisely, the police may not enter a private residence without a warrant unless both "probable cause plus exigent circumstances" exist.  *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (per curiam); *United States v. Chambers*, 395 F.3d 563, 572 (6th Cir. 2005).  There is no dispute that the warrantless search of McClain's home on October 12, was "presumptively unreasonable" under the Fourth Amendment.  *Payton v. New York*, 445 U.S. 573, 586 (1980).  The government, however, contends that probable cause and exigent circumstances justified the warrantless search.

In general, exigent circumstances exist when "real immediate and serious consequences" would certainly occur if a police officer were to "postpone[ ] action to get a warrant."  *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984) (internal quotation omitted).  "The exigent circumstances exception relies on the premise that the existence of an emergency situation, demanding urgent police action, may excuse the failure to procure a search warrant."  *United States v. Radka*, 904 F.2d 357, 361 (6th Cir. 1990).  We have identified the emergency situations giving rise to the exigent circumstances exception to the warrant requirement as (1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, or (4) a risk of danger to the police or others.  *United States v. Williams*, 354 F.3d 497, 503 (6th Cir. 2003) (citing *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994)).  Because warrantless searches are presumptively unreasonable under the Fourth Amendment, the government bears a "heavy burden" of proving exigency.  *Welsh*, 466 U.S. at 749-50.

In attempting to satisfy its burden, the government primarily relies on the established precedent in this circuit that the police may "enter a residence without a warrant if there is probable cause to believe that there is a burglary in progress."  *United States v. Reed*, 141 F.3d 644, 649 (6th Cir. 1998) (citing *United States v. Johnson*, 9 F.3d 506, 509-10 (6th Cir. 1993)).  Because both probable cause and exigency must be present for the police to make a warrantless entry and search of a home, we emphasized in *Johnson* that when the police have probable cause to believe that a burglary is in progress, they are also confronted with the necessary exigency, that is, the need "to ensure the protection of everyone on the scene and to prevent the loss or destruction of the owner's property."  *Johnson*, 9 F.3d at 510.  The government further relies on our statement in *Rohrig* that "we are not precluded from fashioning a new exigency" that would justify the warrantless entry into a citizen's home.  *Rohrig*, 98 F.3d at 1519; *see also United States v. Plavcak*, 411 F.3d 655, 663 (6th Cir. 2005).  But neither *Johnson* nor *Rohrig* helps the government here because the government's argument is premised on its claim that the officers had probable cause to believe a burglary was in progress at 123 Imperial Point.  As we explain below, the undisputed facts in this case demonstrate that the police did not have probable cause to believe that a burglary was in progress; hence there was no exigency as a consequence of the possible burglary such that *Johnson* would support the warrantless entry.  And because the government's premise has always been that the exigency was created by probable cause to believe there was a burglary in progress, we have no occasion to consider whether, as *Rohrig* might permit, we should fashion a new exigency in this case.

"Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion."  *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (en banc) (internal quotation omitted).  Under this "flexible, common-sense standard," *Texas*

*v. Brown*, 460 U.S. 730, 742 (1983), the establishment of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). However, the "mere possibility" that a crime could be occurring within a home is not sufficient to justify a warrantless search; the police must have an "objectively reasonable basis for their belief" that a crime is being committed. *United States v. Ukomadu*, 236 F.3d 333, 337 (6th Cir. 2001). Likewise, mere speculation that a crime could be occurring is insufficient to establish probable cause. *See McCurdy v. Montgomery County, Ohio*, 240 F.3d 512, 519 (6th Cir. 2001).

In our view, a neighbor's phone call indicating that the owners had moved out of the house at 123 Imperial Point several weeks earlier and that there was a light on in the house that had not been on before, even coupled with the officers' discovery of a slightly ajar front door, does not present the type of objective facts necessary to establish probable cause that a burglary was in progress at the house. Under similar circumstances, our precedent has required more—namely, the existence outside the searched premises of some physical signs of a burglary or some direct evidence of a home invasion. *Johnson*, 9 F.3d at 509-10 (holding that probable cause and exigent circumstances justified a warrantless search when officers responded to a burglary in progress after a neighbor reported seeing individuals crawl through a window of a residence, and upon arriving on the scene, the officers observed a broken window and two individuals inside); *United States v. Estese*, 479 F.2d 1273, 1274 (6th Cir. 1973) (holding that exigent circumstances justified a warrantless search after the police responded to a radio call and discovered that the door to an apartment had been pried open). We agree with the district court that the facts of this case are more analogous to the facts of *United States v. Selberg*, 630 F.2d 1292 (8th Cir. 1980), in which the Eighth Circuit held that a neighbor's contacting the police to report that the front door of a nearby home was open, in the absence of any other signs of a burglary or suspicious activity, did not justify the warrantless entry into the home. *Id.* at 1293-94, 1296.

We understand that these officers were responding to a "suspicious incident" call and, and we find no evidence that they acted in bad faith when, after finding the front door to McClain's home slightly ajar, they went inside to ensure that no criminal activity was afoot. Sometimes the line between good police work and a constitutional violation is fine indeed. Here, however, the officers' own testimony at the suppression hearing reveals that they had no objective basis for their concern that a burglary was being committed at McClain's residence. Both officers testified that there was no emergency necessitating their entry into the home. Officer Germany testified that upon inspecting the exterior of the house, he observed no movement in or around the home, no signs of forced entry or vandalism, and no suspicious noises or odors emanating from the house. Officer Williams similarly testified that upon his arrival he observed no signs of any criminal activity. Officer Williams even stated that the officers' hunch that a burglary could be occurring inside the residence was mere "speculation." Speculation does not equate to probable cause. *See Ferguson*, 8 F.3d at 392 (defining probable cause as "reasonable grounds for belief, supported by less than prima facie proof *but more than a mere suspicion*") (emphasis added). Indeed, mere speculation that a crime could be occurring, without more, simply does not suffice to overcome the presumption of unconstitutionality attached to a warrantless intrusion into the sanctity of the home.

Because the government must demonstrate both probable cause and exigent circumstances to justify the warrantless entry, we need not reach the issue of exigent circumstances. We would simply note that both officers explicitly testified that there was no emergency necessitating their entry into McClain's home. The *sine qua non* of the exigent circumstances analysis is the existence of an "emergency situation." *Radka*, 904 F.2d at 361. "Where, as here, officers are not responding to an emergency there must be *compelling reasons* to justify the absence of a search warrant." *McDonald v. United States*, 335 U.S. 451, 454 (1948) (emphasis added). Such compelling reasons cannot be established under the facts of this case where officers who were not faced with an

emergency situation, however good their intentions, had only an unparticularized hunch that a crime was being committed inside McClain's home.

Because neither probable cause nor exigent circumstances justified the officers' warrantless entry and search of McClain's home on October 12, 2001, we find no error in the district court's conclusion that the entry and search were in violation of the Fourth Amendment.

## C. VALIDITY OF THE WARRANT SEARCHES AND THE GOOD FAITH EXCEPTION

Our analysis does not end here, however. Under the unique circumstances presented by this case, we are called upon to address an issue of first impression in this circuit—namely, we must reconcile the "good faith" exception established in *Leon*, 468 U.S. at 919, with the "fruit of the poisonous tree" doctrine first coined in *Nardone v. United States*, 308 U.S. 338, 341 (1939). The essence of that doctrine is that evidence unlawfully obtained, including all derivative evidence flowing from it, should be suppressed. *See Segura v. United States*, 468 U.S. 796, 804 (1984). The exclusionary rule would therefore work to exclude all evidence obtained subsequent to and as a consequence of an illegal search because, as the fruit of a prior illegality, such evidence is tainted unless (1) the government learns of the evidence from an "independent source," *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920); (2) the connection with the unlawful search becomes "so attenuated as to dissipate the taint," *Nardone*, 308 U.S. at 341; or (3) the evidence "would inevitably have been discovered." *Nix v. Williams*, 467 U.S. 431, 444 (1984). We find that none of these three exceptions to the exclusionary rule applies here.

In *Leon*, the Supreme Court announced another exception to the exclusionary rule, holding that the rule should not apply to evidence obtained by an officer who conducts a search in reasonable reliance on a search warrant that was issued by a neutral and detached magistrate, but is ultimately found to be unsupported by probable cause or otherwise defective. *Leon*, 468 U.S. at 920-22. In general, suppression of evidence obtained pursuant to a search warrant later found to be defective "should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.* at 918. In particular, the *Leon* court explained, suppression is appropriate if (1) the magistrate was "misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) the magistrate "abandoned his judicial role" or neutrality; (3) the warrant was "so lacking in indicia of probable cause" as to render official belief in its existence unreasonable; or (4) the warrant was so "facially deficient" that it could not reasonably be presumed valid. *Id.* at 923. We agree with the government that none of these factors is present in this case.

The wrinkle in the case before us today is that the warrants on which the officers relied—reasonably, we think—to search 123 Imperial Point a second time and to search the five other properties were themselves the fruit of the poisonous tree. The question therefore becomes whether the good faith exception to the exclusionary rule can apply in a situation in which the affidavit supporting the search warrant is tainted by evidence obtained in violation of the Fourth Amendment. The Ninth and Eleventh Circuits have answered that question in the negative. *United States v. McGough*, 412 F.3d 1232, 1239-40 (11th Cir. 2005) (holding that the good faith exception does not apply where a search warrant is issued on the basis of evidence obtained as the result of an illegal search); *United States v. Wanless*, 882 F.2d 1459, 1466-67 (9th Cir. 1989) (same); *United States v. Vasey*, 834 F.2d 782, 789 (9th Cir. 1987) (holding that a "magistrate's consideration of the evidence does not sanitize the taint of the illegal warrantless search"). On the other hand, the Second and Eighth Circuits have held that, at least under some circumstances, the *Leon* good faith exception can still apply when the warrant affidavit relies on evidence obtained in violation of the Fourth Amendment.

In *United States v. Fletcher*, 91 F.3d 48, 51-52 (8th Cir. 1996), the Eighth Circuit held that the *Leon* exception was applicable to the warrant-authorized search of a bag, even though the officers' initial detention of the bag in order to subject it to a dog sniff violated the Fourth Amendment. The court explained that the the circumstances surrounding both the initial detention of the bag and the subsequent issuance of the warrant were "sufficiently close to the line of validity" that the officers had "an objectively reasonable belief that they possessed a reasonable suspicion such as would support the valid detention of [the] bag as well as an objectively reasonable belief that the warrant issued was valid." *Id.* at 52. *See also United States v. Kiser*, 948 F.2d 418, 421-22 (8th Cir. 1991) (same); *United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989) (same); *United States v. Thomas*, 757 F.2d 1359, 1368 (2d Cir. 1985) (holding *Leon* applicable to the subsequent warrant-authorized search of an apartment, even though the affidavit contained evidence obtained in violation of the Fourth Amendment, because the officer, who was acting in good faith, disclosed all information to the magistrate and had no reason to believe that his actions were unconstitutional); *but see United States v. Reilly*, 76 F.3d 1271, 1281-82 (2d Cir. 1996) (holding *Leon* inapplicable where officers seeking warrant acted in clear bad faith by failing to disclose to the magistrate in their warrant affidavit the circumstances surrounding a dubious pre-warrant search); *United States v. O'Neal*, 17 F.3d 239, 243 n.6 (8th Cir. 1994) (holding that a magistrate's issuance of a search warrant could not sanitize prior illegal conduct when the method by which evidence supporting the search warrant was seized was "clearly illegal").

We conclude that this is one of those unique cases in which the *Leon* good faith exception should apply despite an earlier Fourth Amendment violation. We find *White*'s statement of the rule in *Leon* particularly instructive: "evidence seized pursuant to a warrant, even if in fact obtained in violation of the Fourth Amendment, is not subject to the exclusionary rule if an objectively reasonable officer could have believed the seizure valid." *White*, 890 F.2d at 1419. The court in *White* refused to apply the exclusionary rule because the facts surrounding the initial Fourth Amendment violation were "close enough to the line of validity to make the officer's belief in the validity of the warrant objectively reasonable." *Id.* The same is true here. The facts surrounding these officers' warrantless entry into the house at 123 Imperial Point were not sufficient to establish probable cause to believe a burglary was in progress, but we do not believe that the officers were objectively unreasonable in suspecting that criminal activity was occurring inside McClain's home, and we find no evidence that the officers knew they were violating the Fourth Amendment by performing a protective sweep of the home. More importantly, the officers who sought and executed the search warrants were not the same officers who performed the initial warrantless search, and Officer Murphy's warrant affidavit fully disclosed to a neutral and detached magistrate the circumstances surrounding the initial warrantless search. On the basis of that affidavit, the magistrate issued the search warrants. There was indeed nothing more that Officer Murphy "could have or should have done under these circumstances to be sure his search would be legal." *Thomas*, 757 F.2d at 1368. Because the officers who sought and executed the search warrants acted with good faith, and because the facts surrounding the initial warrantless search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable, we conclude that despite the initial Fourth Amendment violation, the *Leon* exception bars application of the exclusionary rule in this case. *See Leon*, 468 U.S. at 920 (explaining that the exclusion of evidence will not further the purposes of the exclusionary rule "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope").

## III. CONCLUSION

For the foregoing reasons, we **REVERSE** the judgment of the district court and we **REMAND** this case for further proceedings consistent with this opinion.

---

**CONCURRING IN THE JUDGMENT**

---

BOGGS, Chief Judge, concurring in the judgment. Although I concur with the majority's decision to reverse the judgment of district court, I write separately because, respectfully, I do not agree that the initial search of 123 Imperial Point was unreasonable.

To overcome the presumption that a warrantless search of a private residence is presumptively unreasonable, the police must demonstrate probable cause and, in this instance, exigent circumstances. In this circuit, only four situations clearly give rise to exigent circumstances: (1) hot pursuit of a fleeing suspect; (2) imminent destruction of evidence; (3) need to prevent a suspect's escape; and (4) danger to the police or to the public. *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir. 1994); *see also United States v. Haddix*, 239 F.3d 766, 767 (6th Cir. 2001). However, following the lead of other circuits, this circuit has also upheld warrantless searches conducted during suspected burglary investigations under the exigent circumstances exception. *United States v. Johnson*, 9 F.3d 506, 509 (6th Cir. 1993); *United States v. Estese*, 479 F.2d 1273, 1274 (6th Cir. 1973). In addition, the court has opined that:

> these existing categories do not occupy the entire field of situations in which a warrantless entry may be justified. As an initial matter, the Fourth Amendment's broad language of "reasonableness" is flatly at odds with any claim of a fixed and immutable list of established exigencies. Moreover, such a claim would ignore the case-by-case and fact-specific development of the existing categories of exigent circumstances. None of the presently recognized exigencies can claim any special constitutional status; instead, each was a product . . . of a particular case in light of underlying Fourth Amendment principles. . . . Therefore, if the situation dictates, we are not precluded from fashioning a new exigency that justifies the warrantless entry into Defendant's home.

*United States v. Rohrig*, 98 F.3d 1506, 1519 (6th Cir. 1996). The court assesses the police officers' belief in the existence of an exigent circumstance based upon the "objective facts reasonably known to, or discoverable by, the officers at the time of the search." *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir. 1995). *See also Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990). But this is a relatively forgiving standard, as the Supreme Court explained:

> "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability."

*Ibid*. (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)).

Upon approaching 123 Imperial Point, Officer Germany knew that the house had reportedly been vacant for some time and that a neighbor had called and reported a light on inside. Checking the doors and windows, Officer Germany saw and heard nothing amiss until he reached the front door, which he found ajar. The fact that the officer neither saw signs of forced entry nor heard any noises does not mean there were no possible crimes being committed inside. The house was two stories; the officer testified that a light was on upstairs. Obviously, he could not see into the second floor windows. The house was also not small. It had several bedrooms and a basement. It certainly would be possible for an intruder to have been inside the house, even talking or vandalizing the place, without noise being audible from outside. Therefore, all the officer knew was that a house,

reported by a named neighbor to have been vacant for some time, had lights on, no car visible suggesting the owner had returned, and that the front door was ajar, with no porch lights on. Even if the officer could see no signs that the door had been forced, the door could have been left unlocked, the lock could have been picked, or the keys stolen.

The officer had to use his best professional judgment. Admittedly, as Appellees suggest, the officer could have taken other action. Even though it was a Friday night, he could have tried, but did not, to determine who owned the house and attempt to contact him about the supposed intruder. He could have set up a barricade around the house and waited for any intruder to leave. Or he could simply have waited until he had located a judge who would sign a search warrant. While any of these courses of action might have been possible, a "court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed . . . years after the fact." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991). I believe that Officer Germany did act reasonably.

The cases Appellees cite, to argue that this situation could not reasonably lead an officer to believe there was an exigent circumstance, simply do not compare with the case at bar. In *United States v. Selberg*, 630 F.2d 1292 (8th Cir. 1980), the door to the trailer had been open when Selberg left the day before. The trailer was not vacant, and all the officer needed to do to satisfy himself that nothing was amiss was look inside. He did not need to enter to see that no burglary had occurred. In *United States v. Morgan*, 743 F.2d 1158 (6th Cir. 1984), the police waited hours before raiding Morgan's house and did so based solely on the warning of an anonymous person that Morgan was armed. Finally, in *United States v. Williams*, 354 F.3d 497 (6th Cir. 2003), the DEA officer entered the house without a warrant, even though the testimony of the landlord concerning her suspicions of a marijuana growing operation would have been sufficient to get a warrant and despite the fact that nothing she told them suggested there was any immediate danger.

In none of these cases was an officer confronted with a situation in which he had limited information, all of which suggested the possibility of a crime in progress, and based on which he had to make an immediate decision about how to act. In such an ambiguous situation, the court can only ask that the police act "sensibly," as a reasonable man making reasonable assessments of probability would act under the same circumstances. *Rodriguez*, 497 U.S. at 186.

In order to make a search reasonable, there must be a balance of the intrusiveness of the search against the exigency of the circumstance. Both are merely estimates of probability, and must be taken together. In this case, the balance of all the information available to the officers was that the house was indeed abandoned, and was not an active residence of a legitimate occupant. Nothing that they saw through the windows or, indeed, once they entered the house (fast food wrappers, one suitcase and a television, and potential contraband in an empty house) negated this perception. This is quite different from the *Selberg* case, where all the evidence available indicated a legitimate occupant who was merely temporarily absent. On the other hand the exigency, even were I to agree with the court's opinion that it did not amount to probable cause (but see page 10, *infra*) amounted to a very plausible belief that there was a good chance that criminal activity, perhaps even violent activity, was afoot.

As I attempt to assess the reasonableness of the officers' actions in entering the house (as opposed to simply allowing whatever was going on within the house to continue, perhaps for many hours until the hypothesized alternate courses could develop) the fact that this was a situation where a common sense assessment would be that a legitimate owner, could that person have been contacted, would want the officers to investigate the possible break in, tips me in the direction of finding the actions reasonable.

In addition, the various comments in the majority's opinion (at pages 5-6) that the officers conceded that there was no emergency may represent a somewhat overenthusiastic reading of the transcript. The supporting testimony comes from the officers, at best, agreeing with words put in their mouths in an artful cross examination.

Finally, a word on "probable cause." While courts have resisted mightily putting a number on probable cause, *see Maryland v. Pringle*, 540 U.S. 366, 371 (2003), at bottom a review of cases indicates that there must be some, albeit inchoate, feeling as to what kind of probability constitutes probable cause. My reading is that it does not require a belief that there is more than a 50% probability of evidence being found in a particular location. *See, e.g., United States v. Gourde*, 382 F.3d 1003, 1015 (9th Cir. 2004) (Gould, J., concurring) (collecting cases). If that were the case, one could never get a search warrant to search all three cars of a person for whom there was overwhelming evidence of general drug dealing, and specific evidence of a drug transaction the proceeds of which were now certainly in one of three cars in his garage, and certainly not in any of the others. However, to be more than a hunch or a supposition, in my own mind, requires a legitimate belief that there is more than a 5 or 10 percent chance that a crime is being committed or that evidence is in a particular location. Using this standard, my judgment would be that there was probable cause to believe that criminal activity was afoot in the house, based on the information on which the officers could reasonably rely that there was not a legitimate reason for activity in the house.

Therefore, I would uphold the initial warrantless search as falling under the exigent circumstances exception.